UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF STORAGE UNIT NUMBER 1648 AT U-HAUL STORAGE OF BANGOR (170 WASHINGTON STREET, BANGOR) | No. 1:22-mj-00126-JCN |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2008. I am currently assigned to the DEA Bangor, Maine Post of Duty, within the New England Field Division. I have conducted and participated in investigations relating to the distribution of controlled substances—including cocaine, cocaine base, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances—in violation of federal anti-drug laws, including Title 21, United States Code, Section 841(a)(1). I have conducted or participated in surveillance, undercover transactions, the execution of search and arrest warrants, and debriefings of informants and confidential sources. I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of controlled substances. I have received specialized training in narcotics investigations and drug identification at the DEA Training Facility in Quantico, Virginia.

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c). As a federal agent, I am authorized to investigate violations of the laws of the United States, to execute warrants issued under the authority of the United States, to seize property, and to make arrests for violations of Title 21 of the United States Code.

3. The facts and information contained in this affidavit are based on my personal

knowledge and observations, as well information obtained from other special agents, task force officers, and law enforcement officers involved in this investigation, and information gained through my training and experience. The following information is based in part upon information I received from Maine Drug Enforcement Agency ("MDEA") Special Agent Nickolas Huggins.

4. Based on my training and experience and the facts set forth in this affidavit, I submit that there is probable cause to believe that the items identified in **Attachment B** are presently located within the Target Location identified in **Attachment A**. Such items are or constitute evidence of one or more violations of Title 21, United States Code, Section 841(a), property designed or intended for use or which has been used to commit such violations, the fruits of such violations, and/or contraband or things otherwise illegally possessed.

5. My affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PLACE TO BE SEARCHED

6. I seek a warrant to search **storage unit number 1648** at U-Haul Storage of Bangor, located at 170 Washington Street, Bangor, Maine ("the Target Location"). The Target Location is rented to Laquinn D. Evans. The Target Location is further described as a five-foot by five-foot by ten-foot storage unit with an orange metal roll-up door marked "1648", as identified in **Attachment A**.

## DESCRIPTION OF PROPERTY TO BE SEIZED

7. I have probable cause to believe that the Target Location identified in Attachment A may contain the following items of evidence, all of which are evidence of one or more drug offenses set forth in Title 21, United States Code, Section 841(a), property designed or intended for use or which has been used to commit such offenses, the fruits of such offenses, and/or

contraband or other items illegally possessed, and which are seizable pursuant to Federal Rule of Criminal Procedure 41:

(a) Controlled substances, including scheduled drugs;

(b) Packaging materials;

(c) Paraphernalia for packaging, processing, diluting, weighing, or distributing controlled substances, for example: plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute controlled substances;

(d) Firearms and ammunition;

(e) U.S. Currency or other negotiable instruments;

(f) Safes or other secure storage containers (without the need for a separate search warrant);

(g) Documents, papers, records, correspondence or notes, or other effects or items of personal property, tending to show ownership of, dominion and control over, or access to the storage locker and/or its contents, or tending to show the identity of the person(s) who held such dominion and control or access to the storage locker and/or its contents, for example: rental agreements, photographs, mail, bills, personal telephone books, identification documents, and keys;

(h) Books, records, receipts, notes, ledgers, or other documents relating to obtaining, secreting, transferring, concealing, or expending income from controlled substances and expenditures of money and wealth, for example: currency, financial instruments, jewellery, invoices, records of real estate transactions, bank statements and related records, letters of credit, money orders, wire transfers, cashier's checks, and receipts, bank and credit card statements, deposit and withdrawal slips, ATM receipts, passbooks, checkbooks, safety deposit box keys, money wrappers, and check registers;

(i) Records, ledgers, or other documents regarding the distribution of controlled substances, including the identity of drug customers, moneys owed or paid, and amounts of money or drugs distributed or received;

(j) Currency counting machines; and

(k) Cellular telephones, tablets, computers, or any other electronic storage devices and media that may have been used to commit or facilitate the commission of violation of Title 21 of the United States Code.

As listed in **Attachment B**.

## FACTS SUPPORTING PROBABLE CAUSE

8.      On July 28, 2022, at approximately 0840 hours, Officer Duncan Bowie of the Bangor Police Department responded to U-Haul Storage of Bangor, located at 170 Washington Street in Bangor, Maine. There was a report of a large quantity of narcotics found inside unit 1648/the Target Location by U-Haul staff. U-Haul staff advised that their building had been impacted by a flood/broken water line, resulting in severe damage to many storage units. Staff was actively accessing customers' units to assess/inspect for damage and clean or make necessary repairs.

9.      Officer Bowie spoke with the U-Haul Storage manager, who advised that, during the inspection of the Target Location, an employee located a large quantity of suspected narcotics in two reusable shopping bags.

10.     Officer Bowie looked inside the reusable shopping bags located by U-Haul staff. He observed several packages of an opaque, waxy substance in both bags. He also observed bags of a similar substance with different levels of cloudiness in their appearance, as well as one or more small bags containing a green pressed pill.

11.     According to U-Haul Storage, the Target Location has been rented to Laquinn Evans since July 6, 2021. Records show he last entered the Target Location at the U-Haul facility on Monday July 25, 2022, at approximately 14:17:09 hours and left approximately 4 minutes later. The Target Location has a sensor which activates when the door is rolled up and down. U-Haul staff advised that customer access to the Target Location is limited to Laquinn Evans and his contractual authorized user, who I identify herein as Subject 1.

12. Laquinn Evans is currently on Maine State probation for a 2013 conviction for aggravated trafficking (a class A offense) that resulted in a six-year prison sentence followed by four years of probation. Evans is subject to conditions of probation prohibiting him from possessing drugs.

13. The suspected narcotics located by U-Haul staff were transported to the Bangor Police Department. One reusable shopping bag contained a gallon-sized zip-lock bag containing suspected methamphetamine. The suspected methamphetamine resembled crystal methamphetamine and was opaque in color. A photograph of the zip-lock bag is included below:



14. Detective Joseph Orcutt of the Bangor Police Department conducted a Tru-Narc scan of a quantity of the suspected methamphetamine. The Tru-Narc scan yielded a positive result for methamphetamine.

15. Detective Orcutt utilized the Tru-Narc device to scan various suspected drugs located in both reusable shopping bags. In one shopping bag, he located the following substances:

    A. 435.2 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine;

    B. 401.2 grams gross weight of a substance that showed a positive Tru-Narc result for cocaine;

    C. 100 grams gross weight of a substance that showed a positive Tru-Narc result for cocaine; and

    D. 36 grams gross weight of pressed green pills that showed a positive Tru-Narc result for methamphetamine.

16.   In the other shopping bag, Detective Orcutt located the following substances:

    A. 460 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine;

    B. 2,268 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine;

    C. 470 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine;

    D. 460 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine;

    E. 466.5 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine;

    F. 86.5 grams gross weight of a substance that showed a positive Tru-Narc result for methamphetamine; and

    G. 186.5 grams gross weight of a substance that showed a positive Tru-Narc result for heroin.

## TRAINING AND EXPERIENCE OF AFFIANT

17. Based on my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that:

    A. Drug traffickers often store drugs in private places and often secret or store drugs in other items to disguise drugs and prevent their detection by law enforcement. Traffickers often secrete and store contraband, proceeds of drug sales, and records of drug transactions in secure storage containers to prevent easy access by others, including law enforcement officers, and to conceal those items.

    B. Drug traffickers, especially those involved in the possession and distribution of large quantities of narcotics, often possess and store firearms and ammunition with or near their narcotics in order to protect themselves, their supplies of drugs, and/or drug proceeds;

    C. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts, and other documents relating to the transportation, ordering, sale, and distribution of controlled substances. Such items are typically maintained where the traffickers have ready access to them, such as in their residences or in locations over which they exercise dominion and control. Traffickers commonly maintain records, ledgers, or other documents identifying drug customers, moneys paid or owed, and amounts of money or drugs distributed or received;

    D. Drug traffickers often secrete, transfer, conceal, or expend income from their distribution activities, such as through laundering that income to conceal the source of that income. Drug traffickers often maintain books, records, receipts,

notes, ledgers, and other documents relating to obtaining, transferring, concealing, or expending money and income. Such documents include financial instruments, jewelry, invoices, records of real estate transactions, bank statements and related records, letters of credit, money orders, wire transfers, cashier's checks, and receipts, bank and credit card statements, deposit and withdrawal slips, ATM receipts, passbooks, checkbooks, safety deposit box keys, money wrappers, and check registers.

E. Drug traffickers often purchase and/or title their assets in fictitious names, aliases, or names of relatives, associates, or business entities to avoid detection of these assets by law enforcement. Even though such assets are in the names of others, the trafficker actually owns and continues to use such assets and to exercise dominion and control over them;

F. Drug traffickers commonly maintain books, papers, or other documents that reflect names and/or telephone numbers of their associates and/or customers;

G. Drug traffickers often take or cause to be taken photographs of themselves, their associates, their drugs, their money, and their firearms.

H. Drug traffickers regularly and frequently utilize cellular telephones, tablets, computers, and other electronic storage devices and media in furtherance of their trafficking activities, including to communicate with their sources of supplier, their distributors, their customers, and their associates.

18. Based on my training and experience, I also know that the distribution of large quantities of controlled substances generally involves the receipt and/or exchange of U.S. Currency or other negotiable instruments in exchange for those controlled substances.

Individuals involved in the distribution of controlled substances often use currency counting machines to accurately count large quantities of currency obtained as proceeds from the sale of narcotics. Narcotics traffickers must often maintain large amounts of U.S. Currency on-hand to maintain and finance their ongoing distribution activities.

19.     I am also aware that those involved in the distribution of controlled substances frequently separate and package larger quantities of controlled substances into smaller amounts for the purpose of easily conducting sales of personal-use quantities to customers. Those involved in the distribution of controlled substances frequently utilize digital scales to weigh quantities to be packaged for sale. Other items of paraphernalia are also regularly used in packaging, processing, diluting, and distributing controlled substance, including plastic bags or pieces thereof, heat-sealing devices, funnels, sifters, grinders, glass panes, mirrors, razor blades, and other non-narcotic substances to "cut" or dilute controlled substances. Traffickers frequently "cut" or dilute controlled substances before distributing the substances to customers in order to stretch their supply.

20.     Based on my training and experience, people involved in distributing narcotics sometimes seal and prepare parcels in a manner intended to make detection of illegal narcotics difficult by law enforcement and drug detecting canines. I am aware that controlled substances are typically packed in some form before being placed in a package to be mailed. The materials in which controlled substances are packaged may be used, or intended, to disguise the scent of controlled substances or otherwise to obscure their contents. Such packaging materials may include Styrofoam packing peanuts, tape or other sealing materials, plastic wrap, bubble wrap, fabric softener sheets, fresh coffee grounds, and other materials intended to defeat detection by trained narcotics canines. Such materials may contain additional evidence identifying the

individual or individuals who owned or exercised dominion and control over the contents, such as fingerprints or genetic materials.

21. When drugs are stored in a location away from a drug trafficker's residence—such as in a storage locker, as in this case—traffickers often store other items as well. Documents, papers, records, correspondence, notes, and other effects or items of personal property may demonstrate, or assisting in demonstrating, ownership of, dominion and control over, or access to the storage location and its contents. Such items, which may include rental agreements, photographs, mail, bills, personal telephone books, identification documents, and keys, may identify, or assist in identifying, the person(s) who held such dominion and control or access to the storage location and its contents.

22. Based upon the information set forth above, and in light of my training and experience, I have probable cause to believe the storage locker identified in **Attachment A** presently contains items that constitute evidence of one or more violations of Title 21, United States Code, Section 841(a)(1), property designed or intended for use or which has been used to commit such violations, the fruits of such violations, and/or contraband or things otherwise illegally possessed, as identified in **Attachment B**. I request that a warrant issue.

Nicholas Rich, Special Agent
U.S. Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Jul 28 2022

City and state: Bangor, ME

John C Nivison U.S. Magistrate Judge
Printed name and title